IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CASEY A. DRAKE | § | |
| | § | |
| v. | § | NO. 4:23-CV-01021-BD |
| | § | |
| CRETE CARRIER | § | |
| CORPORATION, *et al.* | § | |

### MEMORANDUM OPINION AND ORDER

Defendants Crete Carrier Corporation and Reuben Robert Shaffer moved to exclude two of plaintiff Casey A. Drake's expert witnesses, Mr. Robert Kelly and Dr. Jack Leifer. Dkts. 49 (Kelly), 50 (Leifer); *see* Dkts. 52 (response to Dkt. 50), 53 (response to Dkt. 49), 62 (supplemental motion to exclude Leifer), 64 (joint status report), 65 (supplemental notice by the defendants). The court held a hearing on the motions. Minute Entry for Dec. 16, 2025. It will grant in part and deny in part the motion to exclude Kelly, Dkt. 49, and deny the motion to exclude Leifer, Dkt. 50.

### BACKGROUND

Drake sued the defendants for personal injuries arising from a vehicle collision. Dkt. 9. Drake was riding in a car driven by his niece, Erica Diehl. Dkt. 48 at 3. Shaffer was driving a tractor-trailer. Dkt. 44 at 2. As the two drivers passed a wrecked vehicle, they collided. *Id.*; Dkt. 48 at 3. Drake retained Kelly and Leifer as experts to testify that Shaffer caused the collision. Dkt. 40. The defendants moved to exclude their testimony. Dkts. 49, 50.

### LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It was amended in 2023 to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The 2023 advisory committee note explains that the amendment was meant to (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court instructed courts to serve as gatekeepers when applying Rule 702 to determine whether expert testimony should be presented to the jury. 509 U.S. 579, 589–95 (1993). Courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That "gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

Under the *Daubert* test, which examines the underlying theory on which an expert opinion is based, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible, in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

The Fifth Circuit explained several decades ago that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration." *Viterbo v. Dow Chem.*

*Co.*, 826 F.2d 420, 422 (5th Cir. 1987). And although the 2023 advisory committee note to Rule 702 criticized unspecified judicial decisions concluding that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," it also acknowledged that "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility even under the [Federal] Rule 104(a) standard," which is less permissive than Rule 104(b). *Compare* Fed. R. Evid. 104(a) (providing that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible") *with id.* R. 104(b) (providing that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist" and that "[t]he court may admit the proposed evidence on the condition that the proof be introduced later"). In other words, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, advisory cmte. n. to 2023 amend.

It remains the case that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (explaining that, "[a]lthough the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert conclusions themselves"). Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory cmte. n. to 2000 amend.).

## DISCUSSION

### I. Kelly

The defendants argue that Kelly's testimony is inadmissible because Kelly is not qualified as a causation expert, his methods are unreliable, and his opinion regarding Crete's conduct is based

on inaccurate facts and not relevant to the issue of causation. Kelly is qualified to and can reliably speak on causation, but his testimony regarding hiring, recordkeeping, and training is irrelevant to the claims at issue and will therefore be excluded.

### A. Qualification

The defendants argue that Kelly is not qualified to opine on the cause of the collision because he is not an accident reconstructionist. Dkt. 49 at 6. Drake responds that Kelly's experience as a police officer makes him qualified. Dkt. 53 at 5–6. Drake is correct. An expert must be qualified by his "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, but he need not have a particular job title, *Williams v. Warren*, No. 99-41078, 2001 WL 498501, at *2 (5th Cir. Apr. 10, 2001). A police officer may testify about the cause of a traffic accident if he has sufficient skill and knowledge. *Smith v. Chrysler Grp., LLC*, No. 1:15-cv-218, 2017 WL 7788131, at *2 (E.D. Tex. June 8, 2017).

Kelly was a police officer for ten years. Dkt. 53-4 at 1. During that time, he investigated more than 300 collisions involving commercial vehicles. Dkt. 53-5 at 1. He has certifications specific to traffic enforcement and is certified as a driving instructor for commercial vehicles. Dkts. 53-2 at 1, 53-4 at 1–2. That all indicates that Kelly has sufficient experience working with commercial vehicles and investigating collisions involving them to opine on the cause of the collision at issue here. *See Smith*, 2017 WL 7788131, at *2 (collecting cases supporting that conclusion).

### B. Reliability

The defendants also argue that Kelly's testimony would be unreliable because he based his opinion solely on two photographs and did not visit the accident scene, conduct any interviews, or take any measurements. Dkt. 49 at 6–7. In particular, the defendants argue that Kelly does not have a reliable basis to testify that

> the SUV involved in the previous collision was occupying not only the left-hand lane but also extended into the right-hand lane as well. This means that it would have been impossible for Defendant [Shaffer] to maintain his vehicle in the right-hand lane and pass the previous collision without moving to the shoulder of the roadway.

4

Dkt. 53-2 at 6–7.

Kelly based that opinion on his review of footage recorded by a responding police officer's body camera, two frames of which are reproduced in his report. *Id.*; Dkt. 53 at 8. Those frames appear to show the hood and front tires of the disabled vehicle extending into the right lane over the dashed white line that divides the road. Kelly also reviewed the responding officer's crash report, which repeated Diehl's claim that Shaffer moved from the right lane into the right-hand shoulder and struck her car. Dkt. 53-2 at 6.

As with an expert's qualifications, whether an expert's methodology is reliable depends on the particular circumstances of each case. *Kumho Tire Co.*, 526 U.S. at 150. Reviewing photographs, especially where, as here, that review is bolstered by other materials, is not necessarily an unreliable method. In appropriate circumstances, photographs can provide sufficient information for an expert to apply his knowledge and experience and form an opinion. *Bostick v. State Farm Mut. Auto. Ins. Co.*, 321 F.R.D. 414, 417 (M.D. Fla. 2017).

Whether a vehicle has space to maneuver is the kind of determination an expert can make based on his review of photographs and videos alone. By reviewing the images available here, Kelly could see the amount of unobstructed space in the right lane of traffic and, applying his knowledge, determine whether or not a tractor-trailer would be able to safely traverse the lane without moving into the shoulder. That means Kelly's opinion about the cause of the accident is based on sufficiently reliable data.

C.  Irrelevance of Crete's conduct

Kelly also stated his opinions about Crete's hiring of Shaffer, Shaffer's qualifications, whether Crete kept adequate records, and whether Shaffer was adequately trained. Dkt. 53-2 at 8–11. The defendants challenge those opinions as unreliable and as irrelevant to the central issue of causation. Dkt. 49 at 8–9.

Drake does not assert a direct negligence claim against Crete. He seeks to hold Crete vicariously liable for Shaffer's alleged negligence at the time of the collision. Dkt. 9. Whether Shaffer was qualified, whether Crete kept adequate records, and whether Shaffer was adequately

5

trained do not bear on whether Shaffer was negligent at that time. Evidence that has no tendency to make a material fact more or less probable is not admissible. Fed. R. Evid. 401–02. As such, Kelly's opinions about hiring, qualifications, record keeping, and training will be excluded.

## II. Leifer

The defendants argue that Leifer is not qualified to testify about the cause of the collision and that his testimony is unreliable. Dkt. 50. They are wrong on both counts.

### A. Qualification

The defendants argue that Leifer, like Kelly, is not qualified to opine on the cause of the collision because he is not an accident reconstructionist. Dkt. 50 at 6. (They also argue that Leifer is not qualified because he is not a medical professional. *Id.* But that argument goes to the cause of Drake's injuries, not the cause of the collision. Because the parties have stipulated that Leifer will not testify about the cause of any injury, Dkt. 64 at 1, that argument need not be addressed.)

As an initial matter, it is not clear that Leifer is not an accident reconstructionist. His curriculum vitae ("CV") indicates that he is an affiliate of the Society of Accident Reconstructionists and a member of the Texas Association of Accident Reconstruction Specialists. Dkt. 52-7 at 8. Describing his license to perform engineering services, Leifer explains that he has "provided expert opinions requiring knowledge in impact computation, damage assessment from photographs, motion analysis, materials evaluation." *Id.* He is responsible for numerous publications and presentations about topics related to accident reconstruction, *id.* at 2–7, and he has participated in continuing education courses dedicated to accident reconstruction, *id.* at 9. That sure makes him sound like an accident reconstructionist.

But even assuming he does not technically fit that description, his job title is not determinative. *See supra* Part I.A. His report discusses, based on the damage to Diehl's car and the conditions of the roadway, the forces that likely applied to the vehicles and the relative speeds that would probably have generated those forces. Dkt. 52-5 at 10–11. An accident reconstructionist or not, Leifer is a mechanical engineer who has taught university courses relating to dynamics, kinematics, and statics and has published multiple works related to the relationships between impacts and

6

force. Dkt. 52-5; *see* McGraw-Hill Dictionary of Scientific and Technical Terms 668 (6th ed. 2003) (defining "dynamics" as a "branch of mechanics which deals with the motion of a system of material particles under the influence of forces"); *id.* at 1153 (defining "kinematics" as "the study of the motion of a system of material particles without reference to the forces which act on the system"); *id.* at 2022 (defining "statics" as a "branch of mechanics which treats of force and force systems abstracted from matter, and of forces which act on bodies in equilibrium").

Leifer's observations are based in physics, and his CV reflects substantial knowledge and experience in the relevant scientific fields. He is well-qualified to opine and reasonably apply his observations to the facts of this case.

**B. Reliability**

The defendants make three arguments that Leifer's methods and data are unreliable. First, they assert that Leifer relied on a scientific study that is old and distinguishable from the facts of this case. Dkt. 50 at 7. Second, they argue that, during his deposition, Leifer could not "[s]tate [w]ith [c]ertainty" how the collision occurred. Dkt. 62 at 1. Finally, they note that Leifer could also not initially state at his deposition what source supported his opinion that lanes of traffic are generally 11–12 feet wide. *Id.* at 4. The second two of those arguments were raised only in a supplemental motion filed after the deadline to object to expert testimony, Dkt. 62; *see* Dkt. 39 (then-operative scheduling order), raising a question about their timeliness. But the court need not consider that question, which Drake did not raise, because none of the arguments has merit.

As to the first argument, both the study Leifer relies on and his own opinion are grounded in physics. The laws of physics operated the same way in 2002, when the challenged study was published, as they did when the collision at issue here occurred. *See* Robert Thomson & Jarkko Valtonen, *Vehicle Impacts in V-Shaped Ditches*, 1797 Transp. Rsch. Rec.: J. of Transp. Rsch. Bd., no. 1, 2002, at 1. And although the jury will be free to weigh the differences between the collision in this case and the experimental conditions in the 2002 study, that study could still inform an expert about how force is exerted on vehicles, such that the expert could apply that knowledge to the facts here. That is what Leifer did.

7

As to the second argument, Leifer testified that the collision might have occurred in one of three ways: Shaffer's tractor-trailer was moving to the right, Diehl's car was straddling the fog line, or Diehl was moving to the left. Dkt. 62-1 at 9–10. Although Leifer conceded that any of those three scenarios was possible, he testified that it is most likely that Shaffer was moving to the right at the time of the collision. *Id.* at 10–12. That opinion was based on his opinions that Shaffer's vehicle was likely moving faster than Diehl's and that it would have been unsafe for Shaffer to drive straight through the right lane without moving to the shoulder. Dkt. 53-5 at 10–11. Leifer did not say that he knew with certainty what happened, but "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert*, 509 U.S. at 590.

As to the defendants' final argument, Leifer's inability to recite, on the spot during his deposition, a source stating that traffic lanes are generally 11–12 feet wide does not impugn his report's validity. Leifer testified that he used the standard width of a traffic lane to calculate an approximate location of the collision. Dkt. 65-1 at 36. Although he also testified that traffic lanes are generally 11–12 feet wide, *id.*, that figure does not appear in his report. And although he could not to provide a citation for the figure when he was first asked about it, he returned with a citation after a break. It would be unreasonable to deem his testimony unreliable just because he had not memorized the citation for a figure, particularly one that did not appear in his report. In any event, the actual width of the lanes according to the defendants, 12.5 feet, Dkt. 62-1 at 7–8, falls within the margin of error Leifer allowed, *id.* at 37. Leifer's testimony need only be reliable, not unquestionable, for the jury to properly weigh it. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 589–90).

## CONCLUSION

It is **ORDERED** that:

1) the motion to exclude Kelly's testimony, Dkt. 49, is:

    a) **GRANTED** to the extent it challenges Kelly's testimony about Crete's hiring of Shaffer, Shaffer's qualifications, whether Crete kept adequate records, and whether Shaffer was adequately trained; and

    b) **DENIED** to the extent it challenges Kelly's testimony about causation; and

2) the motion to exclude Leifer's testimony, Dkt. 50, is **DENIED**.

So **ORDERED** and **SIGNED** this 5th day of January, 2026.

_____
Bill Davis
United States Magistrate Judge